CAZ HASHEMI, State Bar No. 210239
chashemi@wsgr.com
BEN CROSSON, State Bar No. 247560
bcrosson@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (866) 974-7329

JESSICA L. SNORGRASS, State Bar No. 259962
jsnorgrass@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067
Telephone: (424) 446-6900

*Attorneys for Defendants*
*Flux Power Holdings, Inc. and Ronald F. Dutt*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASFA KASSAM, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FLUX POWER HOLDINGS, INC., RONALD F. DUTT, and CHARLES A. SCHEIWE,<br><br>Defendants. | Case No. 3:25-cv-00113-JO-DDL<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS FLUX POWER HOLDINGS, INC. AND RONALD F. DUTT'S MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>CLASS ACTION<br><br>Date: July 17, 2025<br>Time: 9:30 a.m.<br>Courtroom: 4C, Fourth Floor<br>Before: Hon. Jinsook Ohta |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .........................................................................................................1

    I.    BACKGROUND FACTS.................................................................2

        A.    Flux Power's Prior Disclosed Material Weaknesses..................2

        B.    Flux Power's September 2024 Restatement Announcement..................................................................................3

        C.    The Company's Independent Auditor Transition......................5

        D.    The Restatement and Mr. Dutt's Retirement............................5

        E.    The Amended Complaint's Allegations .....................................6

        F.    The Purported Confidential Witnesses .......................................7

ARGUMENT...............................................................................................................7

    II.    THE REFORM ACT'S FORMIDABLE PLEADING REQUIREMENTS.........................................................................7

    III.    THE AC FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER..........8

        A.    Allegations About The Restatement Do Not Give Rise To A Strong Inference Of Scienter ......................................................9

        B.    The Company's Transition To A New Auditor Does Not Give Rise To A Strong Inference Of Scienter...........................11

        C.    Mr. Dutt's Retirement And The Other Departures Do Not Support Mr. Dutt's Scienter........................................................13

        D.    The Confidential Witness Statements Fail To Show That Mr. Dutt Knew Of Any Improper Accounting Or Material Weaknesses ...............................................................................15

            1.    FE1 Does Not Support Scienter .....................................15

            2.    FE2 Does Not Support Scienter .....................................17

            3.    FE3 Does Not Support Scienter .....................................18

            4.    FE4 and FE5 Do Not Support Scienter ........................19

        E.    Lack of Motive Allegations Undermine An Inference Of Scienter ...................................................................................22

        F.    The Competing Inferences Undermine Scienter .....................22

    IV.    THE SECTION 20(a) CLAIM FAILS .............................................23

V.    THE AMENDED COMPLAINT MUST BE DISMISSED AGAINST FLUX POWER IF SCIENTER HAS NOT BEEN ADEQUATELY PLED AS TO MESSRS. DUTT AND SCHEIWE ............................................................................23

CONCLUSION...........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**<u>Pages</u>**

## CASES

*Alaska Elec. Pension Fund v. Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006) ...............................................11, 16, 21

*Alaska Elec. Pension Fund v. Adecco S.A.*,
256 F. App'x 74 (9th Cir. 2007) ................................................................. 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................... 13

*Cement Masons & Plasterers Jt. Pension Tr. v. Equinix, Inc.*,
No. 11-01016SC, 2012 WL 685344 (N.D. Cal. Mar. 2, 2012) ..................... 22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
Tech., Inc.*,
No. 12-cv-06039-WHO, 2013 WL 6441843
(N.D. Cal. Dec. 9, 2013) ............................................................................ 13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.
v. Align Tech* ,
856 F.3d 605 (9th Cir. 2017) ..................................................................... 13

*DSAM Global Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002) ................................................................. 9, 24

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ............................................................18, 23, 24

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ..................................................................... 10

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. Aug. 31, 2010) ........................................... 21

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) ....................................................... 12

*In re Downey Sec. Litig.*,
No. CV 08-3261-JFW, 2009 WL 2767670
(C.D. Cal. Aug. 21, 2009) .....................................................................21, 22

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..................................................10, 11

*In re Immersion Corp. Sec. Litig.*,
No. C 09-4073 MMC, 2011 WL 6303389
(N.D. Cal. Dec. 16, 2011) .......................................................................... 17

*In re Immersion Corp. Sec. Litig.*,
No. C09 4073 MMC, 2011 WL 871650
(N.D. Cal. Mar. 11, 2011) .......................................................................... 20

*In re Int'l Rectifier Sec. Litig.*,
No. CV07-02544-JFWV BKX, 2008 WL 4555794
(C.D. Cal. May 23, 2008)......................................................................9, 10

*In re Maxwell Techs, Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014)....................................12, 17, 18, 20, 21

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014).......................................................8, 23, 24, 25

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)...........................................................................23

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
No. C 05-0295, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006)......................19

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996)...........................................................................14

*In re Taleo Corp. Sec. Litig.*,
No. C 09-00151 JSW, 2010 WL 597987
(N.D. Cal. Feb. 17, 2010)..................................................................................9

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)...........................................................................14

*Local 353, I.B.E.W. Pension Fund v. Zendesk, Inc.*,
No. 21-15785, 2022 U.S. App. LEXIS 5490
(9th Cir. Mar. 2, 2022) ....................................................................................24

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ..........................................................................17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)................................................................7, 9, 21

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020).....................................................................7, 8, 23

*Nozak v. Northern Dynasty Minerals Ltd.*,
804 F. App'x 732 (9th Cir. 2020)....................................................................24

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
50 F. Supp. 3d 1328 (C.D. Cal. 2014).............................................................10

*Pittleman v. Impac Mortg. Holdings, Inc.*,
No. SACV 07-0970 AG (MLGx), 2009 WL 648983
(C.D. Cal. Mar. 9, 2009) .................................................................................23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
No. 10-CV-03451-LHK, 2012 WL 1868874
(N.D. Cal. May 22, 2012).................................................................................19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .............................................................1, 7, 19

*Prodanova v. H.C. Wainwright & Co.*,
   993 F.3d 1097 (9th Cir. 2021) ........................................................................ 8, 22

*Schueneman v. Arena Pharms. Inc.*,
   840 F.3d 698 (9th Cir. 2016) ................................................................................ 8

*Sharenow v. Impac Mortg. Holdings, Inc.*,
   385 F. App'x 714 (9th Cir. 2010) ....................................................................... 23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) .......................................................................................... 8, 22

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ............................................................................. 14

*Zamir v. Bridgepoint Educ., Inc.*,
   No. 15-CV-408 JLS (DHB)
   2018 WL 1258108 (S.D. Cal. Mar. 12, 2018) ................................................. 9, 24

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .......................................... 8, 11, 12, 13, 14, 15, 16
                                                                 17, 19, 21, 22

## STATUTES

15 U.S.C. § 78j-1(b) ......................................................................................... 13

15 U.S.C. § 78u-4(b)(2)(A) ................................................................................ 7

Section 10(b) of the Securities Exchange Act of 1934 .................................. 6, 7, 23

Section 20(a) of the Securities Exchange Act of 1934 .................................... 6, 23

## RULES

Fed. R. Civ. Proc. 8 ........................................................................................... 13

Fed. R. Civ. Proc. 9(b) ........................................................................................ 7

Defendants Flux Power Holdings, Inc. ("Flux Power" or the "Company") and Ronald F. Dutt respectfully submit this Memorandum of Points and Authorities in support of their Motion to Dismiss the Amended Complaint (the "AC" or "¶").

**INTRODUCTION**

Mr. Dutt is the former Chief Executive Officer ("CEO") and Chairman of Flux Power.  Prior to his retirement, the Company announced that certain of its historical financial statements would require restatement due to errors relating to Generally Accepted Accounting Principles ("GAAP") for inventory accounting. Relying on conclusory allegations made in hindsight, Plaintiffs allege the Company and individual defendants, Mr. Dutt and the Company's former Chief Financial Officer ("CFO"), Charles Scheiwe, knew the accounting was wrong all along.  But absent are particularized factual details required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") showing that Mr. Dutt acted with a "strong inference" of scienter, *i.e.*, an "intent to deceive, manipulate, or defraud."  *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (citation omitted).

As discussed more fully below, prior to the restatement, Flux Power disclosed that it had material weaknesses in certain controls over financial reporting, and it implemented remedial measures to address and remedy them.  The fact that a restatement was later required does not lead to a conclusion that anything was done fraudulently.  In fact, well-established Ninth Circuit law rejects that exact premise, and instead requires specific allegations that an individual defendant possessed the requisite mental state.  Inaccurate accounting, a failure to follow GAAP or allegations of internal controls issues do not suffice.

To that end, the AC is devoid of *any* allegations of knowledge by Mr. Dutt that the accounting was in error or that the Company's internal controls over financial reporting were not as described in Flux Power's public filings.  While the AC cites vague, non-specific statements from five purported former employees,

MEM. ISO MTD AMENDED COMPLAINT BY DEFS. FLUX POWER HOLDINGS, INC. AND RONALD F. DUTT   -1-   3:25-cv-00113-JO-DDL

tellingly, not one witness purports that Mr. Dutt knew of any accounting issues or undisclosed material weaknesses.  The AC likewise points to no document purporting to evince an intent to deceive, or any motive to do so, and the AC's remaining allegations about circumstances typical to a restatement (*e.g.*, CFO departure, auditor change) are routinely rejected as a basis for scienter.  The only "strong inference" raised by the AC is an innocent one—that Mr. Dutt was contemporaneously unaware of the accounting errors—which thus requires he be dismissed as a defendant from this case.

If the Court agrees that the AC fails to state a claim against the individual defendants for the reasons explained herein and in Mr. Scheiwe's separate memorandum, including for failure to raise a strong inference of scienter as to them, then the AC must also be dismissed against Flux Power.  In the Ninth Circuit, scienter is not shown against a corporate entity unless it is adequately alleged against a speaking corporate officer.  If the Court finds that no claim has been adequately alleged against Mr. Dutt or Mr. Scheiwe, then there necessarily would be no scienter to impute to Flux Power and the claims would need to be dismissed against the Company as well.

## I.    BACKGROUND FACTS

Flux Power designs, develops, manufactures and sells lithium-ion battery packs for use in a range of industrial and commercial sectors, which have benefits such as longer run times and fewer emissions compared to incumbent technologies of lead-acid batteries and propane fueled engines.  ¶¶ 2, 33.  Mr. Dutt was Flux Power's CEO, President and Chairman during the class period, and served the Company in various other roles since 2008.  ¶ 22.  Defendant Charles Scheiwe was the Company's CFO during the class period through March 1, 2024.  ¶ 23.

### A.    Flux Power's Prior Disclosed Material Weaknesses

Prior to its restatement, Flux Power disclosed two material weaknesses in its internal controls over financial reporting.  In its fiscal year ("FY") 2022 Form 10-K

(filed on September 28, 2022), Flux Power announced that management identified a material weakness regarding ineffective oversight of its internal controls over financial reporting and lack of sufficient review and approval of the underlying data used in the calculation of warranty reserve. ¶ 66.[1]  The Company discussed undertaking measures to remediate those issues, including implementing additional control procedures (*id.*), which its subsequent Q1'23 Form 10-Q confirmed were implemented (¶ 71).  By the end of Q2'23, the Company announced it believed it had remediated the material weaknesses.  ¶ 76.[2]

In the Company's subsequent FY23 Form 10-K (filed on September 21, 2023), the Company announced it had identified a new material weakness related to insufficient personnel resources with technical accounting expertise related to certain aspects of the financial reporting process.  ¶ 86.  The Company said management intended to implement measures designed to improve relevant controls to remediate the weakness, and until it had additional resources with such level of technical accounting expertise, it would use "third-party consultants and accounting experts."  *Id*.  The Company later disclosed in its Q3'24 Form 10-Q on May 13, 2024 that it engaged a financial consultant "with extensive technical accounting expertise in order to provide the technical advice needed," and "strengthened the Company's financial expertise" by hiring in early March 2024 an experienced CFO. ¶ 97.  The Company noted that management believed that "such staff and consultant additions have improved our internal control over financial reporting and has moved us towards remediating previously identified material weaknesses."  *Id*.

**B.    Flux Power's September 2024 Restatement Announcement**

On September 5, 2024, Flux Power filed a Form 8-K announcing that its

---

[1] Flux Power's fiscal year ends on June 30.  AC at p. 14 n. 3.

[2] The Company planned to "continue to assess" its internal controls and procedures and "take further action as necessary or appropriate to address any other matters we identify or are brought to our attention."  *Id*.

board of directors concluded that the Company's financial statements for FY23 and the first three quarters of FY24 should no longer be relied on due to errors relating to the improper accounting for inventory and would need restated. ¶¶ 105, 106. The Company explained it found an overstatement of inventory of approximately $1.7 million (which resulted in an overstatement of current assets, total assets, and gross profit, and an understatement of cost of sales and net loss in its financial statements). ¶ 106. Specifically, the Company explained that it became aware that:

> (i) approximately $1.2 million of excess and obsolete inventory, primarily as a result of a change in battery cells from a new supplier, was not properly reserved or written-off in earlier periods resulting in an overstatement of inventory, and (ii) certain loaner service packs [which it gave customers when their unit malfunctioned] were improperly accounted for as finished goods inventory as of June 30, 2023 resulting in an overstatement of inventory of approximately $0.5 million.

¶¶ 40, 106. The Company said that it was evaluating the impact of those errors to determine if additional financial statements would need to be restated. ¶ 106.

The Company's announcement noted its previously disclosed material weakness regarding its technical accounting resources, and said management concluded that the errors announced in the restatement represented an additional material weakness. ¶ 107. The Company discussed plans to continue to devote significant effort and resources to remediation and improvement (including that it had begun updating its processes and controls around inventory obsolescence, the timing of its internal inventory audits and implementation of other measures). *Id.*[3]

On September 30, 2024, Flux Power disclosed that its FY24 annual report would be filed late, as it needed additional time to prepare its restated financial statements. ¶ 111. The Company updated the market on its restatement process in

---

[3] The AC also notes the Company disclosed it engaged an independent law firm to conduct a review of the activities leading to the errors (¶ 107), and the inventory reporting error violated certain requirements under a credit facility agreement, but the non-compliance would be waived in exchange for a waiver fee. ¶¶ 108, 124.

November 2024, disclosing that further review "resulted in estimated noncash inventory write-downs of approximately $4.4 million and related noncash warranty related items of approximately $0.5 million, totaling adjustments of approximately $4.9 million," which would impact multiple quarters over multiple years. ¶ 113.

**C.     The Company's Independent Auditor Transition**

On January 8, 2025, the Company announced that its independent auditor, Baker Tilly U.S. LLP ("Baker Tilly"), would end its engagement with the Company and not stand for re-election after completing the FY24 audit. ¶ 119.  Flux Power announced accounting firm Haskell & White LLP would replace Baker Tilly. *Id.*

**D.     The Restatement and Mr. Dutt's Retirement**

The Company filed its FY24 Form 10-K on January 29, 2025, which restated the Company's financial statements for the periods in FY22, FY23 and the first three fiscal quarters of FY24.  ¶ 121.  The 10-K described the various inventory-related errors, as well as additional accounting errors that were identified and corrected during the restatement process.  ¶ 122.[4]  The 10-K also described the new material weakness of "a lack of sufficiently designed controls that support an effective assessment of our internal controls relating to the prevention of fraud and possible management override of controls."  ¶ 123.[5]

After the restatement was complete, on March 10, 2025, the Company announced that Mr. Dutt notified the board of directors of his decision to retire and

---

[4] The additional accounting revisions related to, for example, revenue recognition vis-à-vis performance obligations for a certain customer contract and associated improperly recorded accounts receivable under the Financial Accounting Standards Board Accounting Standards Codification ("ASC") 210-20, and erroneously presenting non-cash debt issuance cost incurred in conjunction with credit facility arrangements as a non-cash adjustment to reconcile net loss to net cash used in operating activities when such cost should have been recognized as a change in other assets.  ¶ 122.

[5] The Company later reported it would be unable to timely file its Q2'25 report due to, *inter alia*, the delayed FY24 10-K and the replacement of its outside auditor, and that it anticipated reporting a significant increase in administrative expenses relating to the restatement process, which it later disclosed.  ¶¶ 125, 128.

resign from his positions as director, Chairman of the Board, CEO and President of the Company. ¶ 127. The Company had previously announced, on November 21, 2024, that Mr. Dutt had informed the Company's board of his intent to retire. ¶ 22.

### E. The Amended Complaint's Allegations

The AC alleges the Company, Mr. Dutt and Mr. Scheiwe violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), during a class period of November 15, 2021 through February 14, 2025, because: (i) the Company's financial statements from FY22 through Q3'24 contained false financial statements including, among other things, overstatements of inventory, gross profit, current assets, and total assets, and understatements of cost of sales and net loss (*e.g.*, ¶ 55); (ii) Defendants "misleadingly understated and/or omitted material weaknesses" in the Company's internal control over financial reporting; and (iii) the certifications the individual defendants' signed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") were allegedly false in light of the restated financials and challenged material weakness statements. ¶¶ 99-102.

With respect to the material weaknesses, Plaintiffs allege that the Company's three material weaknesses disclosed at different times in the class period were known, and therefore should have been disclosed, as of the beginning of FY22. *E.g.*, ¶ 55. Relatedly, Plaintiffs challenge the Company's risk factors discussing the material weaknesses and remediation efforts described above as misleading and "inadequate," because the Company did not disclose all of the purportedly then-known material weaknesses, and thus "understated the present risk of being unable to maintain effective internal control over financial reporting," where the risk had "already materialized in the form of false financial statements." *E.g.*, ¶¶ 68-69, 73-74, 78-79, 83-84, 88-89.[6] Plaintiffs allege Flux Power's stock price declined after its various class period disclosures above. *E.g.*, ¶¶ 110, 115, 120.

---

[6] Thus, the AC alleges a misleading failure to disclose (i) any material weakness from the Company's Q1'22 through Q3'22 Forms 10-Q, (ii) the material

**F.      The Purported Confidential Witnesses**

The AC cites purported statements by five former employee ("FE") confidential witnesses.  Two were not employed at the Company during the class period; FE4 and FE5 worked at Flux Power only through "October 2021" and "to" November 2021, respectively.  ¶¶ 31, 32.  No FE is alleged to have reported to Mr. Dutt.  *See* ¶¶ 27-32.  Rather, the former employees are alleged to have reported to a combination of Mr. Scheiwe, the Company's Chief Operating Officer ("COO"), its Director of Accounting and FE4.  The only former employees who purportedly even had an indirect reporting line to Mr. Dutt are FE4 and FE5, who are not alleged to have been employed at the Company by the time of the class period.

## ARGUMENT

## II.      THE REFORM ACT'S FORMIDABLE PLEADING REQUIREMENTS

To plead a Section 10(b) and Rule 10b-5 claim, "a plaintiff must allege '(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'"  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020) (citation omitted).  The claims are subject to heightened pleading requirements under Rule 9(b) and the PSLRA's "formidable" pleading standards.  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).  A securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. at 1066 (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  Scienter is an "intent to deceive, manipulate, or defraud."  *Intuitive Surgical*, 759 F.3d at 1061 (citation omitted).

---

weaknesses disclosed on September 21, 2023 and September 5, 2024 from the Company's FY22 10-K through its Q3'23 Form 10-Q and (iii) the material weakness disclosed in the restatement from the Company's FY23 10-K through its Q2'24 Form 10-Q.  ¶¶ 60, 62, 64, 66-67, 71-72, 76-77, 81-82, 86-87, 91-92, 94-95.

To plead scienter, a complaint must "allege that the defendant[] made false or misleading statements either intentionally or with deliberate recklessness." *Endologix*, 962 F.3d at 414 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)) (emphasis added).  "Deliberate recklessness" is "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor *must have been aware of it*."  *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir. 2021) (quoting *Schueneman v. Arena Pharms. Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)) (emphasis added).

Under the PSLRA's high standard, a plaintiff must "plead with particularity facts that give rise to a 'strong'—*i.e.,* a powerful or cogent—inference" of scienter, not merely facts "from which an inference of scienter rationally *could* be drawn." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007).  Where no scienter allegation standing alone is sufficient, courts must consider whether the allegations "holistically" create a strong inference of scienter taken together.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).  The "PSLRA's 'strong inference' requirement has teeth," and is "an 'exacting' pleading obligation . . . that 'presents no small hurdle'" for a plaintiff.  *Endologix*, 962 F.3d at 414 (citations omitted).  Courts must also "compare the malicious and innocent inferences cognizable from the facts pled," and allow the complaint to survive only "if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* at 419 (citation omitted).

## III.  THE AC FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

As discussed below, the AC's generic allegations about the restatement, as well as auditor and executive departures, are routinely rejected by courts as insufficient for scienter.  Moreover, Plaintiffs' own FEs do not even allege that Mr. Dutt knew the Company's accounting was wrong, or knew of any undisclosed

material weakness, thus confirming that no "strong inference" of Mr. Dutt's scienter has been raised.

### A. Allegations About The Restatement Do Not Give Rise To A Strong Inference Of Scienter

It is well-established that the mere fact of a financial restatement does not give rise to a strong inference of scienter.  As the Ninth Circuit held in *DSAM Global Value Fund v. Altris Software, Inc.*, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."  288 F.3d 385, 390 (9th Cir. 2002).  *See also Metzler*, 540 F.3d at 1069 ("'scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP'") (citation omitted).

Instead, violations of GAAP, "even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state." *Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2018 WL 1258108, at *7 (S.D. Cal. Mar. 12, 2018) (dismissing complaint post-restatement for lack of scienter; "'GAAP is not the lucid or encyclopedic set of pre-existing rules that [Plaintiffs] might perceive it to be. . . . There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question'") (quotation and citations omitted); *see also In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987, at *8 (N.D. Cal. Feb. 17, 2010) (no scienter without alleged facts showing that defendants knew specific facts at the time that rendered their accounting determinations fraudulent).[7]

Further, by definition, a restatement can suggest that internal controls were

---

[7] Indeed, courts regularly reject arguments that the magnitude of a restatement (*see* ¶¶ 153-154) establishes or supports scienter.  *E.g., In re Int'l Rectifier Sec. Litig.*, No. CV07-02544-JFWV BKX, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008) (rejecting that magnitude of impending restatement gave rise to a strong inference of scienter absent allegations of defendants' actual mental state).

ineffective, but that too does not suggest that individual defendants acted with scienter. *See, e.g.*, *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (later conclusion that company lacked effective internal controls insufficient to plead scienter); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759-60 (7th Cir. 2007) (affirming dismissal of complaint; rejecting hindsight assertion that defendants "'knew' the financial controls . . . to be inadequate yet failed to disclose this to investors").

In addition, Plaintiffs purport to quote GAAP financial statement principles (¶¶ 41-44) and requirements for inventory accounting (¶¶ 50-53), and suggest that the relevant accounting principles are not "esoteric" and therefore the Company's restatement was not the result of "simply a benign misapplication." ¶ 10. But Plaintiffs offer no support for the self-serving conclusion—nor, conspicuously, do any of their FEs say that to be true. Regardless, courts reject this same argument. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1363 (C.D. Cal. 2014) (rejecting suggestion that the reporting of deferred revenue was "so basic that a court can infer scienter from the mere fact it was reported improperly"); *Int'l Rectifier*, 2008 WL 4555794, at *14 (following restatement, plaintiff provided no reasonable basis for the court to conclude that the accounting "was so simple or basic that defendants could not have made an innocent mistake"). Also non-existent is any allegation that Mr. Dutt as CEO was involved in the Company's accounting or application of GAAP, or knew that the principles were being incorrectly interpreted or applied. This forecloses scienter. *See, e.g.*, *IXIA*, 50 F. Supp. 3d at 1369-70 (dismissing complaint following restatement for failure to satisfy "stringent" scienter pleading standard where allegations failed to show individual defendants knew cited accounting principles were misapplied).

Finally, any attempt to rely on the individual defendants' "senior positions" to allege they knew of the "false financial statements" (¶ 180) is unavailing, as "the high rank of various Individual Defendants within [the company] is insufficient,

without more, to infer a strong inference of scienter." *Hansen*, 527 F. Supp. 2d at 1158-59; *see also, e.g.*, *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 829-30 (S.D. Cal. 2006) (rejecting allegation that top-ranking officers must have been aware of improper accounting), *aff'd*, 256 F. App'x 74 (9th Cir. 2007). The AC also does not allege facts showing that Mr. Dutt had "actual access" to the disputed information, *i.e.*, the proper technical accounting treatment under GAAP and ASC, by virtue of his position. *Zucco*, 552 F.3d at 1000. Nor does it allege that it would be "absurd to suggest" that he was without such knowledge, particularly absent allegations he was involved in or aware of details of the Company's technical accounting determinations. *Id.*[8]

**B. The Company's Transition To A New Auditor Does Not Give Rise To A Strong Inference Of Scienter**

Under controlling Ninth Circuit precedent, "[w]here a resignation occurs slightly before or after the defendant corporation issues a restatement," the "reasonable assumption" is that "the resignation occurred as a result of [the] restatement's issuance itself." *Zucco*, 552 F.3d at 1002. Therefore, a plaintiff must plead facts *refuting* that assumption in order for a resignation to be strongly indicative of scienter. *Id.* Here, no particularized facts about Baker Tilly's decision to not stand for re-election following announcement of the restatement refute the non-fraudulent assumption.

Understandably, the Ninth Circuit has expressly recognized that the resignation of an independent accounting firm shortly after a restatement does not

---

[8] To the extent Plaintiffs may argue the individual defendants' SOX certifications (¶¶ 99-102) support scienter, those allegations are insufficient. Plaintiffs plead no particularized, contemporaneous facts demonstrating Mr. Dutt knew of any errors in the Company's financial reporting or undisclosed material weakness pertinent to the certification at the time signed. *See Zucco*, 552 F.3d at 1003-04 (recognizing that "allowing [SOX] certifications to create an inference of scienter in 'every case where there was an accounting error or auditing mistake made by a publicly traded company' would 'eviscerat[e] the pleading requirements for scienter set forth in the PSLRA.'") (alteration in original) (citations omitted).

MEM. ISO MTD AMENDED COMPLAINT BY DEFS. FLUX POWER HOLDINGS, INC. AND RONALD F. DUTT  -11-  3:25-CV-00113-JO-DDL

raise a strong inference of scienter and "is not surprising -- it had just been partially responsible for the corporation's failure to adequately control its accounting procedures." *Zucco*, 552 F.3d at 1002 (affirming dismissal of complaint for lack of scienter and rejecting that auditor's resignation one month after restatement supported scienter). The AC offers no allegations suggesting a different conclusion here. It does not allege, for example, that Baker Tilly counseled a different accounting treatment than used, believed Mr. Dutt knew the accounting was improper or believed that Mr. Dutt engaged in any other misconduct.

Furthermore, the Company announced in January 2025 that Baker Tilly would end its engagement following the FY24 audit (¶ 119), but Baker Tilly is not alleged to have declined to accept Mr. Dutt's representations as part of that process. Significantly, even where an auditor resigns expressly due to issues with management (which is not alleged here), scienter is not inferred on that basis. *See, e.g.*, *In re Maxwell Techs, Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1039-40 (S.D. Cal. 2014) (a "noisy" auditor withdrawal where the auditor "feels it cannot rely on management's representations . . . does not demonstrate that management acted intentionally or recklessly, rather than acting incompetently, in ignorance, or based on a mistake," and therefore is insufficient alone to establish scienter); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1083 (C.D. Cal. 2012) (scienter allegations inadequate where auditor resigned because it was "'no longer willing to rely on management's representations,'" even where auditor stated it believed management had withheld crucial financial information and made misrepresentations) (citation omitted). In fact, if Baker Tilly believed that any executive had committed fraud, it would have been required to submit a notice to the U.S. Securities and Exchange Commission under Section 10A of the Exchange Act.[9] Baker Tilly is not alleged to have done that, and the fact that Haskell &

---

[9] Section 10A provides that if an auditor becomes aware of information indicating that an illegal act has or may have occurred, it must, *inter alia,* inform the

White LLP took over reflects they too trusted Mr. Dutt's representations. In sum, the circumstances of the transition detract from (not raise) an inference of scienter.

### C.    Mr. Dutt's Retirement And The Other Departures Do Not Support Mr. Dutt's Scienter

For employee departures to support scienter, a plaintiff "must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F.3d at 1002. Mr. Dutt retired in March 2025. ¶ 22. Plaintiffs offer no well-supported facts for the assertion that his retirement was "actually the result of" "being forced out" due to his "role in, and knowledge or reckless disregard of" the alleged fraud, or that the Company's "formal explanation[]" of the departure as "voluntary" was a "false representation[] negotiated as part of [his] departure[] to allow Defendants to save face." ¶¶ 116 & n.10. Such "'naked assertion[s]' devoid of 'further factual enhancement'" do not suffice even under Rule 8 pleading (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), and the "bare fact" standing alone of a resignation "cannot support a strong inference of scienter." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-cv-06039-WHO, 2013 WL 6441843, at *14 (N.D. Cal. Dec. 9, 2013), *aff'd*, *Align Tech I*, 856 F.3d 605 (9th Cir. 2017); *see also Zucco*, 552 F.3d at 1002 (rejecting allegation that CFO's retirement just prior to disclosure of improper accounting and lack of financial controls supported scienter where plaintiff did not even plead, *inter alia*, whether CFO was nearing retirement age). Absent are any well-pled facts to allow the Court to find Mr. Dutt's retirement at the end of his long tenure at Flux Power "suspicious."[10]

---

company's management and audit committee. 15 U.S.C. § 78j-1(b)(1). If the illegal act is material to the company's financial statements, senior management has not taken remedial actions and that failure is expected to warrant a departure from the audit report or resignation, the auditor must report its conclusions to the board of directors and ensure the SEC receives a copy of the report. *Id.* at (b)(2), (3) and (4).

[10] The Company's FY24 10-K, which is cited extensively in the AC (*e.g.*, ¶¶ 59, 61, 63, 65, 70, 75, 80, 85, 90, 93, 96, 121-124), states that Mr. Dutt was 77 years of

Mr. Scheiwe's departure announced on February 23, 2024, which followed the material weaknesses announced in the Company's FY22 and FY23 Forms 10-K, is addressed in his memorandum. Plaintiffs also point to the departure of the Company's Chief Revenue Officer following announcement of the restatement (¶¶ 5, 23, 118, 141), but "[m]ere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter." *Zucco*, 552 F.3d at 1002. Plaintiffs have not alleged facts sufficient to defeat the more "cogent" and "compelling" inference that the employee "resigned or [was] terminated for unrelated personal or business reasons" as opposed to involvement in fraud, or alleged that the resignations are "so numerous or suspicious" as to raise an inference of Mr. Dutt's scienter. *Id.* (rejecting that resignation of two company controllers, prior to disclosure of improper accounting and lack of financial controls, supported scienter absent particular facts about company's hiring and firing of controllers during class period to "extract a strong inference of scienter from otherwise mundane turnover in the corporation's financial department"); *see also Webb v. Solarcity Corp.*, 884 F.3d 844, 847, 857 (9th Cir. 2018) ("corporate reshuffling" just before restatement, and CFO departure five months after, "unpersuasive" for scienter absent facts to rebut assumption that changes were due to restatement) (citing *Zucco*, 552 F.3d at 1002).

---

age at the time of the filing. *See* Declaration of Benjamin M. Crosson, Ex. 1 at 4 (Flux Power Form 10-K for the fiscal year ended June 30, 2024, filed on January 29, 2025). The Ninth Circuit allows a court to consider a document on a motion to dismiss "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quotations and citation omitted). Under the incorporation by reference doctrine, courts may consider the full text of incorporated documents, "including portions which were not mentioned in the complaints." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

MEM. ISO MTD AMENDED COMPLAINT BY DEFS. FLUX POWER HOLDINGS, INC. AND RONALD F. DUTT   -14-   3:25-CV-00113-JO-DDL

**D.      The Confidential Witness Statements Fail To Show That Mr. Dutt Knew Of Any Improper Accounting Or Material Weaknesses**

Confidential witness ("CW") allegations must "provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco*, 552 F.3d at 995.  This requires examining "the level of detail" provided by the sources, "the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id*. (citations omitted) (internal quotation marks omitted).  Here, the level of detail in the FE statements is *de minimis*, at best, and several have no personal knowledge of class period events.  Tellingly, no FE provides any particularized facts showing (or even coming *close* to showing) that Mr. Dutt knew of the accounting errors or later-identified material weaknesses at the time of the challenged statements, thus undermining the AC's claim of his knowledge and its theory of fraud.

**1.      FE1 Does Not Support Scienter**

FE1 (Director of SEC Reporting from January 2020 to May 2024), who reported to Mr. Scheiwe, "prepared and filed all SEC documents for Flux Power" and coordinated year-end audits and quarterly reviews.  ¶ 28.  FE1 claims there were "concerns at Flux Power" about its internal controls by "at least 2022" that "Dutt and Scheiwe would have been aware of," which were "specifically about a lack of secondary reviews for financial accounting statements."  ¶¶ 28, 133.  FE1 also explains the Company *addressed* these concerns.  According to FE1, the Company "attempted to address this issue by implementing additional signatures on the approval of documents, journal entries, and estimated reserves," and "implemented new control procedures" focusing on review and sign-offs for financial schedules and reporting, including manual journal entries involving significant estimates and assumptions, which the Company's Accounting Manager and Mr. Scheiwe, among others, signed.  ¶¶ 133, 134.  This description matches what the Company disclosed

in September 2022 as part of its material weakness remediation efforts (*see* ¶¶ 65-66, 71, 76).  FE1 therefore appears to confirm the Company's remedial efforts in response to its disclosed material weakness, which is plainly inconsistent with scienter.  Of note, FE1's speculation of what Mr. Dutt "would have been aware of" would not suffice for scienter in any event.  *See, e.g.*, *Zucco*, 552 F.3d at 998 (CW speculation of what defendant knew not sufficient to establish personal knowledge or reliability of allegations to support scienter); *cf. Adecco*, 434 F. Supp. 2d at 830 (no showing how CW "would know what [CFO] was aware of").

In addition, Plaintiffs cite FE1's belief that Baker Tilly first raised concerns about Flux Power having insufficient personnel resources, which led to the Company's disclosure about lacking sufficient personnel with technical accounting expertise in financial reporting.  ¶ 137; *see also* ¶ 11 (AC: "Baker Tilly had originally brought these internal controls issues to Defendants' attention in the first place").  But FE1 does not allege that anyone at the Company believed *prior to* the Company's FY23 10-K disclosure that its resources were materially lacking.  *See* ¶ 86.  FE1's description that Flux Power hired a third-party consultant CPA because Baker Tilly "wanted to ensure the accuracy of the financial statements regarding warranty and inventory reserves" (¶ 138) is again consistent with the Company's public statements about its remediation.  *See, e.g.*, ¶ 107 (disclosure that Flux Power "engaged an external financial consultant with extensive technical accounting expertise" during Q3'24).  While FE1 oddly comments that the CPA was an "individual" rather than a "firm," FE1 does not allege that FE1 or Baker Tilly was not satisfied with this person's qualifications or their "independent review of key assumptions and opinions." ¶ 138.[11]

---

[11] FE1's remaining miscellaneous comments are equally vague and not probative of Mr. Dutt's knowledge of accounting and material weaknesses. *E.g.*, ¶ 139 (FE1 did not "observe further changes" to Flux Power's internal controls in the first two months of its new CFO's tenure); ¶ 140 (a board member had "asked Scheiwe to leave"); ¶ 153 (hindsight opinion that overstated inventory was "an

## 2. FE2 Does Not Support Scienter

FE2 (Financial Analyst and Business Intelligence Developer from July 2021 to June 2022), who also reported to Mr. Scheiwe, worked at Flux Power only through June 2022 (in Q4'22) and "mainly manag[ed] the Company's Enterprise Resource Planning ('ERP') systems, which collected data from key business functions[.]" ¶ 38. FE2 makes the unremarkable statements that the Company changed its battery supplier "around 2021" and had an ERP system that could generate a report on aging inventory. ¶ 151. FE2 also makes vague assertions that the Company held "daily morning meetings" "discussing internal control issues," and had "weekly breakout meetings," which Mr. Dutt and Mr. Scheiwe attended (¶ 132), but there is no basis to believe FE2 has personal knowledge of what was discussed at the meetings since FE2 is not alleged to have attended. Also missing is the time period in which these meetings were purportedly held. *Zucco*, 552 F.3d at 997 (failure to provide specifics and dates undermines reliability of allegations).

Further, while the AC states "every department head participated in these meetings, raising relevant issues including obsolescence" (¶ 132), FE2 offers no specifics on what was said (likely because FE2 was not there), nor claims that anyone told Mr. Dutt there were problems with the Company's accounting or financial reporting controls. No strong inference of scienter is raised absent such particularized facts. *See, e.g.*, *In re Immersion Corp. Sec. Litig.*, No. C 09-4073 MMC, 2011 WL 6303389, at *8 (N.D. Cal. Dec. 16, 2011) (CW allegations about side agreement and having "discussions" with individual defendant about "recognizing revenue without proof of delivery" insufficient since no CW "provides facts demonstrating defendants, at the relevant time, had knowledge of information showing revenues were improperly recognized"), *aff'd sub nom. Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014) (citation omitted); *Maxwell Techs.*, 18 F. Supp.

excessive figure"); ¶ 155 (loaner packs were "closely monitored" and "sometimes forgiven, repurchased, or retired to avoid returns").

3d at 1038 (CW statements insufficient because "none . . . indicate that CW5 heard either individual defendant say anything or knew that the individual defendants heard something that indicates that they knew there was a revenue recognition problem"); *cf. Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (even inference that CEO "*should* have known of" [Foreign Corrupt Practices Act] violations "is not sufficient to meet the stringent scienter pleading requirements of the PSLRA").  If FE2 had facts showing Mr. Dutt's knowledge of wrongdoing, including as heard in any meeting, presumably FE2 would have said so.

### 3.     FE3 Does Not Support Scienter

Plaintiffs' reliance on FE3 also underscores the weakness of the AC's scienter allegations.  FE3 (Assistant Controller from October 2017 to March 2024), who reported to Mr. Scheiwe and later to the Company's Director of Accounting, Mike Messervy, "managed accounts payable and vendor relations, produced monthly sales reports, and worked on year-end audits, budget preparation, and analysis," and "performed account reconciliations and assisted with tax filings." ¶ 30.  FE3 purportedly recalled that the finance department employed "only two financial analysts" (the Director of Finance and a Senior Analyst), Mr. Scheiwe "was in charge of financial reporting and staffing adequate accounting personnel" and it was Mr. Scheiwe, FE3 and Mr. Messervy who performed "[m]ost of the Company's accounting work." ¶ 136.  FE3 does not say FE3 believed the staff lacked sufficient technical accounting expertise, nor that Mr. Dutt held that belief prior to announcement of the material weakness.  Moreover, that the CFO and Director of Accounting did "[m]ost of the accounting work" confirms that senior level individuals were responsible for the accounting, which would provide comfort—not concern.

FE3 also claims that "large shareholders" had "expressed a desire to remove" Mr. Dutt as CEO, but he does not allege that had anything to do with any wrongdoing, or how FE3 would even have a basis to know the desires or

motivations of those shareholders.  So too with FE3's claim that Mr. Scheiwe "faced multiple potential terminations by the Board for over a year and a half" before Mr. Scheiwe left the Company.  ¶ 140.  *See Zucco*, 552 F.3d at 995 (CWs must provide basis to determine they have personal knowledge of events they report).[12]

### 4.    FE4 and FE5 Do Not Support Scienter

The statements by FE4 (Senior Manager – Supply Chain from December 2019 through October 2021) and FE5 (Materials Manager from January 2020 to November 2021) are even more irrelevant than those above, as both departed Flux Power before the class period began, and thus have no firsthand knowledge of events occurring contemporaneously with the challenged financial statements.  ¶¶ 31, 32.  Ninth Circuit law is clear that their allegations are afforded little weight in assessing scienter with respect to the class period statements.  *Zucco*, 552 F.3d at 989, 996 (witnesses not employed during class period had "only secondhand information about accounting practices" of time period in question and failed to support scienter); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) (statements of witnesses "not employed   . . . during the entire Class Period . . . are entitled to little weight"), *aff'd*, 759 F.3d 1051 (9th Cir. 2014); *In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C 05-0295, 2006 WL 648683, at *11 (N.D. Cal. Mar. 10, 2006) (rejecting CW allegations where "none of the six informants was employed at SST during the proposed class period").  Even considering their assertions, however, they add nothing significant.

FE4 was purportedly responsible for "production planning, aligning the supply chain, and forecasting," and "reported primarily" to Flux Power's COO, John

---

[12] FE3's remaining assertions merely discuss the build-up of battery inventory during the pandemic due to purchasing more than manufacturing operations was able to support (¶ 142), postponement of orders for two customers (¶ 142) and that loaner battery packs were not well-tracked, about which Mr. Scheiwe reportedly told FE3, and customers often sent them for repairs under warranties (¶¶ 156, 157).  These statements fail to connect to Mr. Dutt's state of mind as to the accounting.

Berry, who reported to Mr. Dutt. ¶ 31. FE5 "manag[ed] inventory and purchas[ed] materials" for battery sales and reported to FE4. ¶ 32. FE4 and FE5 are cited at length (and repeatedly) for their assertions about a build-up in inventory prior to the class period (e.g., ¶ 39 (Flux Power adopted a new battery design); ¶ 144 (existing inventory was not compatible with the new design); ¶ 145 (the new batteries required "all new subcomponents and materials)"; ¶ 143 ("overbuying" materials "happened frequently")), but not much more.

The remainder of their allegations appear to boil down to claims that (i) they raised concerns in meetings with Messrs. Dutt, Scheiwe and Berry about an impact on inventory from switching battery suppliers (¶¶ 144, 145), (ii) they inventoried stock often and reported significant amounts to management (¶¶ 147, 149, 150) and (iii) FE4 raised concerns about tracking of inventory. ¶ 152. But these statements say nothing about the critical question of Mr. Dutt's knowledge of whether such inventory was appropriately accounted for by the finance department, and therefore add nothing to the scienter calculus.

Put differently, even assuming that prior to the class period FE4 and FE5 "raised their concerns" about the "inventory numbers" and "the issues of poor inventory controls (such as engineers and manufacturing employees removing inventory for testing without proper tracking of the inventory)" with "the Company's 'C-Suite'" and Mr. Dutt, this falls far short of informing Mr. Dutt that anything was not being appropriately accounted for; indeed, FE4 and FE5 do not claim to have known any accounting was wrong. See, e.g., *In re Immersion Corp. Sec. Litig.*, No. C09 4073 MMC, 2011 WL 871650, at *7 (N.D. Cal. Mar. 11, 2011) (CW allegation that he met with individual defendant "'to go over the DSO . . . numbers'" insufficient as there was no allegation that anyone actually "'informed [the individual defendant] that revenue was being improperly booked'") (citation omitted); *Maxwell Techs.*, 18 F. Supp. 3d 1023, 1036 (S.D. Cal. 2014) (no inference of scienter because even if CW allegations showed individual defendants knew

about side deals, that "does not indicate that they knew that revenue was improperly booked"); *Adecco*, 434 F. Supp. 2d at 832 (rejecting inference of scienter from CW allegations: "That reserves were reevaluated on a monthly basis does not mandate the conclusion the Defendants knew they should have raised their reserves to adequately cover the uncollectible receivables."); *Zucco*, 552 F.3d at 999 (even CW alleging meetings in which management questioned formulae used to calculate inventory levels at best demonstrated "'disagreement and questioning within [company] about the [accounting numbers],'" not awareness of impropriety) (quoting *Metzler*, 540 F.3d at 1069).[13]

In addition, FE4 and FE5 offer no support for their assumption that Mr. Dutt "ignored" or "disregarded" what they raised (¶ 152), which the AC appears to concede is speculation that itself can be ignored (*see* ¶ 149, alleging Messrs. Dutt, Scheiwe and Berry "*appeared to* simply ignore the problem," based solely on FE5 not being instructed to remove, alter or re-purpose inventory prior to the class period (emphasis added)). *See In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *9 (C.D. Cal. Aug. 21, 2009) (disregard CW speculation).

Finally, FE4 and FE5 opining in hindsight on the pre-class period accounting staff hired by Mr. Scheiwe (*i.e.*, that they were "predominantly younger and inexperienced," "mostly focused on accounts payable," was "mostly junior accountants, and "lacked expertise, and were largely under- or unqualified" (¶ 136)) provides no basis for their conclusions and does not speak to Mr. Dutt's belief as to the qualification of the finance department during the class period. *See, e.g., In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. Aug. 31, 2010) ("opinions and observations" of CWs were insufficient to create inference of

---

[13] While paragraph 148 vaguely states that FE4 "initially alerted" Mr. Dutt that inventory needed written down, this appears to merely be Plaintiffs' characterization of FE4's (pre-class period) allegations discussed above, or Plaintiffs' self-serving conclusion from the preceding sentence in paragraph 148, as there is no specificity as to when this purportedly happened, who was there or what exactly was said, and it lacks corroborating details to warrant consideration.

scienter).  Indeed, Plaintiffs' three other cited FEs, who worked for Flux Power *during* the class period and *in the finance department*, did not report any shortcomings in the accounting staff (and, in any event, the more senior level individuals are alleged to have performed most of the accounting work (¶ 136)).[14]

### E.   Lack of Motive Allegations Undermine An Inference Of Scienter

The AC's lack of allegations of motive commonly found in securities fraud complaints is noteworthy.  As cautioned by the Ninth Circuit, without a plausible motive, Plaintiffs "face a substantial hurdle in establishing scienter." *Prodanova*, 993 F.3d at 1103.  Courts in this circuit recognize that a lack of a well-pled motive can undercut a theory of scienter.  *See, e.g.*, *Cement Masons & Plasterers Jt. Pension Tr. v. Equinix, Inc.*, No. 11-01016SC, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012) (While "'the absence of a motive allegation is not fatal,' . . . it may significantly undermine a plaintiff's theory of fraud.") (quoting *Tellabs,* 551 U.S. at 325).  The AC does not offer (nor could it) any plausible explanation for why Mr. Dutt would try to deceive investors.  Nor does the AC explain why the Company would affirmatively disclose some, but not all, material weaknesses it purportedly knew about (or what incentive it would have to do so).

### F.   The Competing Inferences Undermine Scienter

Courts must "'take into account plausible opposing inferences' that could weigh against a finding of scienter." *Zucco*, 552 F.3d at 1006 (citation omitted). Here, without any allegations of Mr. Dutt's motive to deceive, no witness or document claiming to show his awareness of any accounting errors or material weaknesses in controls prior to their disclosure, and FEs corroborating the accuracy

---

[14] FE5's assertion that "the Company" "preferred . . . to use hidden, easily deleted files on a desktop rather than a transparent tool such as the MRP" is so vague as to be meaningless. *See, e.g.*, *Downey*, 2009 WL 2767670, at *9 (CWs statements are disregarded if lacking in specificity).  FE5 does not say who "the Company" refers to, whether FE5's "MRP" tool that FE5 purportedly developed was validated and reliable or any other coherent and plausible detail relevant to Mr. Dutt's alleged knowledge of improper GAAP accounting.

of the Company's public statements about remedial efforts, the inference raised is non-fraudulent. Further, the fact that upon close inspection the AC pleads *no facts at all* as to Mr. Dutt's state of mind is a basis for dismissal in itself. *See In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) ("[I]n the absence of [corroborating details], [the court] cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made—a required element in pleading fraud.").

## IV. THE SECTION 20(a) CLAIM FAILS

Plaintiffs' failure to plead a primary violation under Section 10(b) requires dismissal of the Section 20(a) claim. *Endologix*, 962 F.3d at 419. Further, the AC does not allege that Mr. Dutt "controlled" Mr. Scheiwe. *See* ¶ 23.

## V. THE AMENDED COMPLAINT MUST BE DISMISSED AGAINST FLUX POWER IF SCIENTER HAS NOT BEEN ADEQUATELY PLED AS TO MESSRS. DUTT AND SCHEIWE

In the Ninth Circuit, scienter is not established against a corporate entity unless it is adequately pled against a speaking corporate officer. *Glazer*, 549 F.3d at 745 (plaintiff was required to plead scienter of the executive "responsible for actually making the statements in the merger agreement"; fact that plaintiff "could have shown that a *different* executive knew about the FCPA violations would do nothing to resuscitate [plaintiff's] claims"); *Pittleman v. Impac Mortg. Holdings, Inc.*, No. SACV 07-0970 AG (MLGx), 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009) (no corporate scienter if no scienter on the part of speaking officers) (citing *Glazer*, 549 F.3d at 736)), *aff'd sub nom. Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010).

Further, in *In re NVIDIA Corporation Securities Litigation*, the Ninth Circuit explained that "'[i]n most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.'" 768 F.3d at 1063 (quoting *Glazer*, 549 F.3d at 743). While the court noted that the collective scienter (or corporate scienter) doctrine "recognizes that it

is possible to raise the inference of scienter without doing so for a specific individual," the Ninth Circuit had "not previously adopted a theory of collective scienter." *Id*. (quoting *Glazer*, 549 F.3d at 744). The Ninth Circuit noted that it had previously opined "that the doctrine might be appropriate in some cases," such as where "'a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication.'" *Id*. (quoting *Glazer*, 549 F.3d at 744.).

The Ninth Circuit has not since expressly adopted the corporate scienter doctrine or opined that the theory could potentially be available beyond the limited circumstances expressed in *NVIDIA*. *See, e.g.*, *Local 353, I.B.E.W. Pension Fund v. Zendesk, Inc.*, No. 21-15785, 2022 U.S. App. LEXIS 5490, at *5 (9th Cir. Mar. 2, 2022) ("even assuming corporate scienter is a viable theory in our circuit, Plaintiffs fail to adequately allege scienter under that doctrine because the statements that Plaintiffs cite to were not 'so dramatically false' that at least some corporate official must have known of their falsity upon publication"); *Nozak v. Northern Dynasty Minerals Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020) ("even putting aside that this court has not adopted the corporate scienter doctrine, Plaintiffs have not alleged a 'dramatic[]' falsehood that would warrant its application") (citing *NVIDIA*, 768 F.3d at 1063)).

It is axiomatic that not all restatements are the result of intentional wrongdoing, which the Ninth Circuit recognizes. *See DSAM*, 288 F.3d at 390 (affirming dismissal of complaint for lack of scienter post-restatement; "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter"). Instead, violations of GAAP (including "significant ones" or ones requiring "large or multiple" restatements) must be augmented by other specific allegations showing the defendants "possessed the requisite mental state." *Zamir*, 2018 WL 1258108, at *7 (dismissing complaint following restatement for lack of scienter) (quotation and citations omitted).

The above arguments as to Mr. Dutt, and Mr. Scheiwe's memorandum, address the AC's allegations specific to their alleged scienter.  In addition, the AC does not contain allegations rising to the level of the statements being "so dramatically false" that executives *must have* contemporaneously known of the material errors in application of GAAP principles.  The AC does not even allege, for example, that the Company's independent outside auditor believed the errors were intentional or fraudulent, that any confidential witness alleged that anyone knew the accounting was wrong or that any internal document reflected that anyone knew GAAP was erroneously applied.  Given the lackluster scienter allegations in the AC, even assuming corporate scienter is viable in this circuit, this is not nearly an exceptional enough case in which to invoke it.  *Compare NVIDIA*, 768 F.3d at 1063-64 (serious defects in two important products held insufficient to warrant application of corporate scienter doctrine), *with Tellabs*, 513 F.3d at 707, 709-10 (corporate scienter applied where, contrary to positive public statements, market for company's flagship product was "evaporating," revenue dropped 43%, profits fell 211% and "not a single [] system" publicly touted as having strong demand was shipped during the relevant period).

## CONCLUSION

For the reasons above, Mr. Dutt respectfully requests that the Court dismiss the AC against him, and the Company respectfully requests that the Court dismiss the AC against Flux Power if it finds that no claim has been adequately alleged against the individual defendants.

Dated: May 12, 2025        Respectfully submitted,


WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/          *Caz Hashemi*
              Caz Hashemi

*Counsel for Flux Power Holdings, Inc. and Ronald F. Dutt*