

Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

[*Additional Counsel on Signature Page*]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

ASFA KASSAM, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

FLUX POWER HOLDINGS, INC., RONALD F. DUTT, and CHARLES A. SCHEIWE,

Defendants.

No. 3:25-cv-113-JO-DDL

**DECLARATION OF JOSHUA BAKER IN SUPPORT OF: (1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARDS TO PLAINTIFFS**

CLASS ACTION

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 3

II. PROSECUTION OF THE ACTION .......... 5

A. Background .......... 5

B. Commencement of the Instant Action .......... 5

C. Lead Counsel's Investigation, the Amended Complaint, And Defendants' Motions To Dismiss .......... 6

D. The Mediation Process Results in a Settlement .......... 7

E. Preliminary Approval of the Settlement .......... 8

III. THE RISKS OF CONTINUED LITIGATION .......... 9

A. Risks to Proving Liability .......... 9

B. Risk of Proving Loss Causation and Damages .......... 10

C. Other Risks, Including Class Certification, Trial, and Appeals .......... 11

D. The Settlement is Reasonable in Light of the Maximum Potential Recovery in the Action .......... 14

IV. UNDER LEAD COUNSEL'S SUPERVISION, THE CLAIMS ADMINSITRATOR DULY EXECUTED THE COURT-APPROVED NOTICE PROGRAM .......... 16

V. OBJECTIONS AND EXCLUSIONS .......... 18

VI. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT .......... 19

VII. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND AWARDS TO PLAINTIFFS .......... 22

A. The Fee Application .......... 22

1. The Outcome Achieved is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action ........ 22

2. Standing and Caliber of Opposing Counsel ........ 24

3. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases ........ 25

4. The Reaction of the Settlement Class to the Fee Application ........ 26

5. Plaintiffs Support the Fee Application ........ 27

B. The Request for Reimbursement of Litigation Expenses Incurred by Plaintiffs' Counsel is Fair and Reasonable ........ 27

C. Awards to Plaintiffs ........ 28

VIII. CONCLUSION ........ 29

I, Joshua Baker, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner at Court-appointed lead counsel The Rosen Law Firm, P.A. ("Rosen Law" or "Lead Counsel"), counsel for Lead Plaintiffs Brandon Paulson and named Plaintiff Thomas Frank Clark (together, "Plaintiffs") in the above-captioned action (the "Action").[1] I oversaw or conducted the day-to-day activities in the Action on behalf of my firm. I am familiar with the proceedings in this litigation and I have personal knowledge of the matters set forth herein based upon supervising and participating in all aspects of the Action.

2. I submit this declaration, together with the attached exhibits, in support of Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $1,750,000 settlement ("Settlement") that the Court preliminarily approved by Order dated December 4, 2025 ("Preliminary Approval Order") (Dkt. No. 68), as well as final approval of the proposed Plan of Allocation for distributing the proceeds of the Net Settlement Fund to eligible Settlement Class Members.

3. I also submit this declaration in support of Lead Counsel's motion for: (a) an award of attorneys' fees in the amount of one-third of the Settlement Fund (*i.e.*, $583,333.33, plus interest earned at the same rate as the Settlement Fund); (b) reimbursement of litigation expenses incurred by Plaintiffs' Counsel in the total amount of $65,904.07, plus interest earned at the same rate as the Settlement Fund; and (c) awards of $7,500 each ($15,000 total) to Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including for

---

[1] All capitalized terms, unless otherwise defined herein, have the meanings set forth in the Stipulation of Settlement dated August 27, 2025 ("Stipulation"; Dkt. No. 60-1).

time spent, incurred in connection with their representation of the Settlement Class ("Fee Application").

4. Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Margery Craig Concerning: (A) Emailing of the Summary Notice and Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Craig Decl.").

5. Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Laurence M. Rosen concerning attorneys' fees and expenses on behalf of Lead Counsel.

6. Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Marion C. Passmore concerning attorneys' fees and expenses on behalf of Additional Counsel for Plaintiff Clark, Bragar Eagel & Squire, P.C. ("BES").

7. Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Brandon Paulson.

8. Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of Thomas Frank Clark.

9. Attached hereto as Exhibit 6 is a true and correct copy of Rosen Law's firm résumé.

10. Attached hereto as Exhibit 7 is a true and correct copy of BES's firm résumé.

11. Attached hereto as Exhibit 8 is a true and correct copy of the Declaration of mediator Robert A. Meyer ("Meyer Decl.").

12. Attached hereto as Exhibit 9 is a true and correct copy of Edward Flores, Svetlana Starykh, and Iveline Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review* (NERA Jan. 21, 2026).

13. Attached hereto as Exhibit 10 is a true and correct copy of a chart providing a survey of law firm billing rates for plaintiff and defense firms in securities actions, derived from public sources indicated in the chart.

## I. INTRODUCTION

14. This is a securities class action brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Plaintiffs assert claims against Defendants Flux Power Holdings, Inc. ("Flux Power" or the "Company"), Ronald F. Dutt, and Charles A. Scheiwe (collectively, "Defendants") for alleged false and misleading statements and omissions of material fact regarding Flux Power's financial statements for each quarter between FY2022 through the third quarter of FY2024. Plaintiffs allege that the price of Flux Power's publicly traded common stock was artificially inflated as a result of Defendants' alleged false and misleading statements, and Flux Power's stock price declined when the truth was revealed through a series of partial disclosures principally concerning the Company's restatement of its financial reports for the relevant periods.

15. The proposed Settlement provides for the resolution of all claims in the Action in exchange for a non-reversionary, all cash payment of $1,750,000. As detailed below, Lead Counsel believes that the Settlement represents a favorable result for the Settlement Class, especially when juxtaposed against the significant risks of continued litigation. Indeed, Defendants had advanced, and would continue to advance, serious arguments with respect to liability (particularly with respect to scienter), and would most likely present robust challenges to Plaintiffs' ability to prove loss causation for each of the several alleged stock drops, which could significantly decrease the amount of aggregate damages.

16. Moreover, the Settlement is the product of a mediator's proposal, by a well-respected mediator experienced with securities class actions, following, *inter*

*alia*: (a) a comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class; (b) reviewing Defendants' motions to dismiss; and (c) a full-day mediation session during which experienced counsel forcefully advocated on behalf of their respective clients. The Settlement is substantively fair, and was achieved through a fair process, and thus Lead Counsel believes that it is in the best interest of the Settlement Class and should be approved.

17. In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed plan of allocation ("Plan of Allocation" or "Plan") as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' consulting damages expert and the Claims Administrator. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Courts routinely approved similar allocation plans, and Lead Counsel believes that the proposed Plan of Allocation here should likewise be approved.

18. Lead Counsel also seek approval of the requests in the Fee Application. As detailed in the concurrently filed memorandum of law in support thereof, the requested fee of one-third of the Settlement Amount falls in line with awards routinely granted by courts in this Circuit in comparable complex litigation with similar stakes, and is a fair and reasonable amount in light of the work performed and the result obtained. Moreover, the out-of-pocket expenses incurred by Plaintiffs' counsel were all reasonable and necessary for the prosecution of the Action. Finally, the requests for awards to Plaintiffs as compensation for their time and dedication spent on overseeing this action on behalf of the Settlement Class are

authorized by the PSLRA and reasonable under the circumstances. The requested amounts of fees and expenses, and the awards to Plaintiffs, are all within the maximum figures proposed in the Notice sent to the Settlement Class. To date, not one Settlement Class Member has objected to any aspect of these requests.

19. For these reasons and those discussed below, Lead Counsel respectfully submit that the $1.75 million Settlement and Plan of Allocation should be approved as fair, reasonable, adequate, and that the requested attorneys' fees of one-third of the $1.75 million Settlement Fund, reimbursement of litigation expenses, and awards to Plaintiffs should be awarded in full.

## II. PROSECUTION OF THE ACTION

### A. Background

20. Flux Power makes lithium-ion battery packs for a range of industrial and commercial sectors, primarily forklift equipment manufacturers. Plaintiffs allege that Defendants made several false and misleading statements during the Settlement Class Period concerning the Company's financial reports, eleven quarters of which had to be restated, and the Company's internal control over financial reporting. Plaintiffs allege that they and the other Settlement Class Members were misled by these statements during the Settlement Class Period and were damaged as a result thereof when the truth was slowly revealed through a series of partial disclosures surrounding the restatement and the consequences thereof.

### B. Commencement of the Instant Action

21. On November 1, 2024, Asfa Kassam filed the first class action complaint in this Action in the District of Nevada. Dkt. No. 1. The complaint alleged violations of the Exchange Act against Defendants Flux Power, Dutt, and Scheiwe. On January 14, 2025, the case was transferred to this Court. Dkt. No. 17.

22. On February 20, 2025, the Court appointed Mr. Paulson to serve as Lead Plaintiff and approved his selection of Rosen Law to serve as Lead Counsel. Dkt. No. 42.

**C. Lead Counsel's Investigation, the Amended Complaint, And Defendants' Motions To Dismiss**

23. Following the appointment of Lead Plaintiff and Lead Counsel, Lead Counsel conducted a thorough investigation into Defendants' allegedly wrongful acts, which included, among other things: (a) reviewing and analyzing (i) Flux Power's filings with the SEC, (ii) public reports, research reports prepared by securities and financial analysts, and news articles concerning Flux Power, (iii) Flux Power's investor call transcripts, press releases, and other public statements made by Defendants prior to, during, and after the Settlement Class Period, and (iv) other publicly available material related to Flux Power; and (b) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information. Lead Counsel also consulted with a financial damages expert.

24. On April 21, 2025, Mr. Paulson, joined by Mr. Clark, filed their Amended Class Action Complaint ("Complaint") against Defendants. Dkt. No. 48. Among other things, the Complaint alleges that Defendants made materially false and misleading statements and omissions, in violation of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. *Id.* Specifically, the Complaint alleges that Flux Power's quarterly and annual financial statements for each quarter and year from FY2022 through the third quarter of FY2024 overstated inventory, gross profit, current assets, and total assets, and understated cost of sales and net loss. As a result, Flux Power had to undertake an expensive investigation and issue restatements for each of those periods. *Id.* Plaintiffs further alleged that the price of Flux Power's publicly traded common stock was artificially

inflated as a result of Defendants' allegedly false and misleading statements and it declined when the truth was gradually revealed through a series of partial disclosures. *Id.* Plaintiffs asserted these allegations on behalf of themselves and a putative class of Flux Power shareholders who purchased the publicly traded common stock of Flux Power between November 15, 2021 and February 14, 2025, both dates inclusive. *Id.*

25. On May 12, 2025, Defendants filed two motions to dismiss the Complaint. Dkt. Nos. 49, 52.

**D. The Mediation Process Results in a Settlement**

26. Before Plaintiffs filed their opposition to Defendants' motions to dismiss, the Parties agreed to participate in a private mediation. On May 27, 2025, the Court stayed the case pending a joint report on the outcome of the mediation. Dkt. No. 55. The Parties selected Robert A. Meyer, of JAMS, to serve as mediator. Mr. Meyer has successfully mediated numerous complex commercial cases, including many securities class action cases. *See* Ex. 8 (Meyer Decl.).

27. Prior to the mediation, Plaintiffs and Defendants exchanged extensive mediation statements that addressed, among other things, issues related to liability, Defendants' motions to dismiss and Plaintiffs' anticipated opposition thereto, and damages. On July 11, 2025, the Parties participated in a full-day mediation session with Mr. Meyer. After hard-fought negotiations facilitated by Mr. Meyer, the Parties ultimately accepted Mr. Meyer's proposal to settle the Action for $1,750,000.

28. The agreement in principle to settle the Action was memorialized in a term sheet executed immediately following the mediation. The term sheet set forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment of $1,750,000 for the

benefit of the Settlement Class, subject to certain terms and conditions, including the execution of a customary "long form" stipulation of settlement and related papers.

**E. Preliminary Approval of the Settlement**

29. The Parties thereafter worked diligently to finalize the Settlement, which involved numerous complex terms and other issues that required substantial negotiation among the Parties. The terms of the Settlement are memorialized in the Stipulation. Dkt. No. 60-1.

30. On August 28, 2025, Plaintiffs moved for preliminary approval of the Settlement. Dkt. No. 60. The Court held a hearing on Plaintiffs' motion on October 23, 2025, ordered slight changes to the proposed notice materials, and requested supplemental information. Dkt. No. 65. After Plaintiffs submitted the supplemental information and changes (Dkt. No. 66), the Court held another hearing on December 4, 2025.

31. On December 10, 2025, the Court issued its Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement. Dkt. No. 68 ("Preliminary Approval Order"). The Preliminary Approval Order preliminarily approved the Settlement, conditionally certified the Settlement Class for settlement purposes only, appointed Plaintiffs as Class Representatives, appointed Lead Counsel as Class Counsel, approved the proposed procedure to provide notice of the Settlement to potential Settlement Class Members, and set April 2, 2026, as the date for the final approval hearing. *Id.* The Settlement Class is defined as:

> [A]ll persons or entities who purchased publicly traded Flux Power common stock between November 15, 2021 and February 14, 2025, both dates inclusive. Excluded from the Settlement Class are: (a) persons who suffered no compensable losses; (b) Defendants; the present and former officers, directors, or control persons of Flux Power at all relevant times; members of their immediate families and their legal representatives, heirs, successors, predecessors, or assigns; present and former parents, subsidiaries, assigns, successors, and

predecessors of Flux Power; and any entity in which any of the persons excluded under this subsection (b) has or had a controlling or majority ownership interest at any time; and (c) persons or entities who file valid and timely requests for exclusion from the Settlement Class in accordance with this Order.

## III. THE RISKS OF CONTINUED LITIGATION

32. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary, all cash payment of $1,750,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case proceeded through additional years of litigation to a potential verdict, followed by the inevitable appeals. Plaintiffs had not yet defeated Defendants' motions to dismiss. Defendants asserted, or could have asserted, many non-frivolous arguments with respect to scienter, loss causation, and damages in this case. These arguments, among many risks, were carefully considered in evaluating whether the Settlement was in the Settlement Class's best interests. At bottom, there was simply no guarantee that Plaintiffs and the Settlement Class would achieve any recovery, let alone one greater than $1.75 million.

### A. Risks to Proving Liability

33. Plaintiffs and Lead Counsel recognized that this Action presented a number of substantial risks to establishing Defendants' liability.

34. Defendants forcefully argued in their motions to dismiss, and undoubtedly would continue to argue at summary judgment and trial, that Plaintiffs had failed to plead and would be unable to prove that the restated financial statements and alleged internal controls statements were made with scienter. Even if Plaintiffs defeated Defendants' motions to dismiss, which focused entirely on the sufficiency of Plaintiffs' scienter allegations, proving those allegations would require extensive document discovery and depositions.

35. In their motions to dismiss, Defendants argued that Plaintiffs failed to allege that the individual Defendants knew about the accounting errors that were later revealed in the restatement, or that the internal controls weaknesses later revealed existed and were known prior to being disclosed. Dkt. Nos. 49, 52. Plaintiffs would need to prove that Defendants misled investors knowingly or with deliberate recklessness in making the alleged false and misleading statements and signing the inaccurate financial reports.

36. There was also no assurance that Plaintiffs would be able to ascertain evidence and testimony sufficient to prove their allegations, or that such evidence would be accepted by the Court at summary judgment or trial. Some of the key events at issue took place several years ago. Memories fade, documents are lost, and Plaintiffs would have had to rely on testimony from people who may well have a personal or professional relationship with Defendants to prove their case.

37. Despite believing this Action is meritorious, Plaintiffs and Lead Counsel were well aware of the high hurdles they would have to surmount to successfully prove Defendants' liability under the federal securities laws.

**B. Risk of Proving Loss Causation and Damages**

38. Even assuming that Plaintiffs overcame the risks of defeating Defendants' motions to dismiss and establishing Defendants' liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

39. Lead Counsel expect that Defendants would have argued that confounding information mitigated or eliminated some of the alleged partial corrective disclosures, and/or that Plaintiffs would be unable to prove that some of the partial corrective disclosures such as the departure of Flux Power executives, were in fact related to, and caused by, the revelation of truth concealed by the alleged false and misleading statements.

40. Pursuant to *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), it is Plaintiffs' burden to prove loss causation and damages. This would require Plaintiffs to proffer expert testimony as to: (a) what the "true value" of Flux Power common stock would have been had there been no alleged material misstatements; (b) the amount by which Flux Power common stock was artificially inflated by the alleged material misstatements; and (c) the amount of artificial inflation removed by the purported partial corrective disclosures. Defendants almost certainly would have retained their own damages expert(s) to present conflicting conclusions and theories as to the reasons for the declines in Flux Power common stock on the alleged disclosure dates. Were any of these arguments to succeed, damages would have been significantly reduced, if not eliminated.

41. The burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process. Additionally, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury. As this Court is no doubt aware, a jury's reaction to complicated expert testimony is highly unpredictable, and there is always the possibility that a jury could be swayed by Defendants' expert(s) and award only a fraction of the damages that Plaintiffs contend were suffered by the Settlement Class. Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.

**C. Other Risks, Including Class Certification, Trial, and Appeals**

42. In addition, any future recovery would require Plaintiffs to prevail at several later stages of the litigation beyond the pleading stage, each of which presents significant risks in complex class actions such as this one. For example, Plaintiffs would have to move to certify the class. While Lead Counsel is confident that all of the Rule 23 requirements are met and that the Court would have certified the proposed class, Defendants would have almost certainly raised arguments

challenging the propriety of class certification. Even if Plaintiffs' class certification motion was granted, Defendants would likely file a Rule 23(f) petition for appellate review. There also would remain a risk that the class could be de-certified at a later stage in the case. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 81 (2d Cir. 2023) (de-certifying the class and effectively ending the case—after approximately 13 years of litigation—based on 2021 Supreme Court decision).

43. Potential arguments raised with respect to loss causation and damages could have also posed a substantial risk to class certification as Defendants would argue a lack of price impact. *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (directing courts to consider "all evidence relevant to price impact" at the class certification stage).[2] In particular, Lead Counsel expects Defendants would have argued that there was a "mismatch" between the generality of alleged misstatements in financial reports and internal controls statements, as compared to certain of the specific corrective disclosures concerning executive departures or costs associated with the restatement. *See id.* As there were only two plaintiffs, if Defendants were able to demonstrate that the Plaintiffs were atypical in any way, it could put the entire case at risk.

44. Plaintiffs would also have to complete substantial fact and expert discovery, which would entail, among other things, negotiation of document production, review and analysis of documents produced by Defendants and third parties, taking and defending percipient and expert depositions, propounding and responding to interrogatories and requests for admission, and defending Plaintiffs' depositions. The costs of each of these tasks would assuredly be high, and the fruits

---

[2] Arguments about price impact generally do not weigh against class certification for settlement purposes. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 232 (2d Cir. 2012).

of each endeavor would be highly uncertain. Furthermore, Plaintiffs would have to successfully navigate and prevail against Defendants' anticipated motions for summary judgment, as well as at trial. And finally, even if Plaintiffs prevailed at each of those stages, they would have to succeed on the appeals that would surely follow. This process could extend for years and might ultimately lead to a smaller recovery, or no recovery at all. Indeed, even prevailing at trial would not guarantee a recovery larger than the $1,750,000 Settlement.[3]

45. Lead Counsel know from painful experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this case is never assured. For instance, in *In re ChinaCast Education Corporation Sec. Litig.*, No. 2:12cv-04621-JFW-PLA (C.D. Cal.), as Co-Lead Counsel, Rosen Law diligently pursued a securities class action for about six years against ChinaCast Education Corporation, a Delaware company operating in China. The effort included a successful appeal at the Ninth Circuit, which reversed the district court's dismissal decision. ChinaCast's insurers refused to cover litigation costs, however, and the company's counsel withdrew from the action leaving ChinaCast unrepresented. The plaintiffs later secured a default judgment of $65.8 million for the class, but the very next day, ChinaCast filed for bankruptcy. In an attempt to recover the default judgment, plaintiffs spent an additional two years pursuing a lawsuit against ChinaCast's multiple insurers. *See Jayhawk Private Equity Fund II LP v. Liberty Insurance Underwriters*, 2:17-cv-05523-GW-RAO

[3] *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

(C.D. Cal.). Unfortunately, plaintiffs' claims were dismissed due to the expansive exclusion provisions in the insurance policies. Therefore, despite approximately eight years of dedicated efforts by the plaintiffs' counsel, there was no financial recovery for the investors. Similarly, in *Sawant v. Ramsey*, 2012 WL 3265020 (D. Conn. Aug. 9, 2012), Rosen Law spent thousands of hours securing a trial verdict only to find it impossible to collect on the judgment. As these examples make clear, complex litigation is uncertain, and success in cases like this one is never guaranteed.

46. Given these significant litigation risks, Plaintiffs and Lead Counsel believe that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

**D. The Settlement is Reasonable in Light of the Maximum Potential Recovery in the Action**

47. In addition to the attendant risks of complex securities class action litigation discussed above, the Settlement is also fair and reasonable considering the maximum potential recovery of available damages. ***If*** Plaintiffs had fully prevailed in their claims at the motion to dismiss stage, at summary judgment, and after a jury trial, ***if*** the Court certified the same class period as the Settlement Class Period, and ***if*** the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to the entirety of each of the six stock price drop dates alleged in this case—***i.e.*, *Plaintiffs' best-case scenario***—Plaintiffs estimated that their total ***maximum*** damages would be approximately $9.2 million. Defendants estimated that the maximum aggregate damages Plaintiffs could recover in their best-case scenario was only $7.0 million. Thus, the $1.75 million Settlement Amount represents approximately 19.0% or 25.0% of the total ***maximum*** damages potentially available in this Action.

48. Moreover, the estimated damages assume that Plaintiffs are given full credit for each of the respective stock drops and does not consider any disaggregation

arguments that Defendants may have raised. *See Destefano v. Zynga, Inc.*, 2016 WL 537946, at *10 (N.D. Cal. Feb. 11, 2016) ("[L]oss causation might have been particularly difficult for Lead Plaintiff to prove, as Defendants would have argued that Lead Plaintiff's expert could not apportion losses to Defendants' misstatements as opposed to other events and information available on the market ...."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by changed economic circumstances, 'changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements.") (quoting *Dura*, 544 U.S. at 343). Even if Plaintiffs were able to establish that at least some portion of the stock price drop on each of the alleged corrective disclosure dates was attributable to the fraud, Defendants likely would have raised arguments concerning the release of other, non-fraud related information on those dates, which could have decreased the amount of recoverable damages even further.

49. In sum, having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and having considered the very real risks presented by the significant hurdles of class certification, summary judgment, trial and any eventual appeals that lie ahead, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

50. Lead Counsel's conclusion that the Settlement is fair, reasonable, and adequate is also supported by Plaintiffs. *See* Exs. 4-5 ¶8.

## IV. UNDER LEAD COUNSEL'S SUPERVISION, THE CLAIMS ADMINSITRATOR DULY EXECUTED THE COURT-APPROVED NOTICE PROGRAM

51. The Court's Preliminary Approval Order directed that the Postcard Notice, email notice, and the Summary Notice, be disseminated to the Settlement Class. Dkt. No. 68. The Preliminary Approval Order also set deadlines for the receipt of objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final fairness hearing date ("Settlement Hearing"). *Id*. These dates were posted to the case-specific Settlement website. *See* Craig Decl. ¶12.

52. Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to begin mailing and emailing notice of the Settlement and to publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice and emailing of the Notice and Proof of Claim form, Lead Counsel instructed SCS to post downloadable copies of the Notice and Proof of Claim form, among other important documents, on the Settlement website. Upon request, SCS mailed and/or emailed copies of the long-form Notice and/or Proof of Claim form to Settlement Class Members and their nominees and will continue to do so until the deadline to submit a Proof of Claim has passed. *Id*. ¶6 and n.2.

53. The Postcard Notice provides a limited description of the Settlement and directs potential Settlement Class Members to downloadable versions of the Notice and Proof of Claim form posted online on the Settlement website. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan, and/or the Fee Application, or to

exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund, reimbursement of litigation expenses in an amount not to exceed $75,000, and awards to Plaintiffs of up to $15,000 total as compensation for their representation of the Settlement Class. *See* Craig Decl., Ex. A (Notice) at 1, 9-10.

54. On December 11, 2025, SCS received from Defendants' counsel a list containing the names and addresses of record holders ("Record Holder List") for the purchasers of Flux Power common stock during the Settlement Class Period. *Id.* ¶6. However, as in most class actions of this nature, the vast majority of potential Settlement Class Members are expected to be beneficial purchasers whose securities are held in "street name"—*i.e.*, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers. The names and addresses of these beneficial purchasers are known only to the nominees. Thus, SCS maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees, as well as mutual funds and other institutional holders. *Id.* ¶4. At the time of the initial mailing, these nominees in SCS's master mailing list included over 2,400 such entities. *Id.*

55. SCS requested that nominees who purchased Flux Power stock during the Settlement Class Period for the beneficial interest of other persons, within ten days from the date of the letter, either (a) send the Postcard Notice or email the link to the location of the Notice and Proof of Claim on the Settlement webpage to their customers who may be beneficial purchasers/owners or (b) provide SCS with a list of names, last known addresses, and email addresses of their beneficial purchasers/owners so that SCS could promptly either mail the Postcard Notice or

email the link to the location of the Notice and Proof of Claim directly to such beneficial purchasers/owners. *Id.* ¶4.

56. As of March 5, 2025, a total of 18,981 potential Settlement Class Members were notified either by mailed Postcard Notice or emailed the link to the Notice and Claim Form. *Id.* ¶9.

57. On January 19, 2026, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *GlobeNewswire*. *Id.* ¶10 & Ex. D.

58. On December 23, 2025, the Settlement website became operational. On the Settlement website, Settlement Class Members can submit a claim online, and download copies of the Notice, Proof of Claim, Stipulation, and Preliminary Approval Order. *Id.* ¶12.

59. The deadline to submit a valid Proof of Claim with all required information was March 3, 2026. Preliminary Approval Order ¶21(a); Craig Decl., ¶15 and Ex. A (Notice) at 2, 8. While SCS will need time to process and validate all of the claims, the total number of claims received to date is 3,473. Craig Decl. ¶15.

60. Once SCS has processed all of the claims it receives, Lead Counsel will move the Court to enter a Class Distribution Order. In conjunction with that motion, Lead Counsel will provide the Court with more detailed information concerning the status of all of the claims received by SCS, and SCS's recommendations regarding the acceptance and rejection of claims.

## V. OBJECTIONS AND EXCLUSIONS

61. The deadline for Settlement Class Members to exclude themselves from the Settlement or object to the Settlement, Plan of Allocation, and/or to the Fee Application is March 12, 2026. To date, not one request for exclusion has been received. Craig Decl. ¶13. SCS will submit a supplemental affidavit after the opt-

out deadline updating the Court with respect to any subsequently received requests for exclusion.

62. To date, no objections to the Settlement, the Plan of Allocation, or the Fee Application have been filed or have otherwise been received by Lead Counsel or SCS. *See id.* ¶14. Lead Counsel will file reply papers on or by March 26, 2026, which will address any objections that may be received.

**VI. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT**

63. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $1.75 million Settlement Amount, plus interest earned thereon, less: (i) Taxes; (ii) Notice and Administration Costs; and (iii) any attorneys' fees, reimbursement of expenses, and awards to Plaintiffs awarded by the Court) must submit a valid Proof of Claim with all required information either online or postmarked no later than March 3, 2026. *See* Craig Decl., Ex. A (Notice) at 2, 8. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the Plan of Allocation, subject to the Plan's approval by the Court.

64. Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' consulting damages expert and the Claims Administrator. The Plan of Allocation is detailed in the long-form Notice. *See* Craig Decl., Ex. A at 4-8. The Notice is posted online at the Settlement website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The objective of the Plan is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of Defendants' alleged violations of the Exchange Act, as opposed to losses caused by market, industry, Company-specific factors or factors unrelated to the alleged violation of law. Under the Plan, each Authorized Claimant will receive their *pro rata* share of the Net

Settlement Fund based on their total Recognized Loss Amount as compared to the total Recognized Loss Amounts of all Authorized Claimants. *See id*. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *See id*.

65. The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Flux Power common stock was artificially inflated during the period between November 15, 2021 and February 14, 2025, both dates inclusive, due to Defendants' alleged materially false and misleading statements. The Plan is based on the premise that the decreases in the price of Flux Power common stock following the six partial corrective disclosures alleged in the Complaint may be used to measure the alleged artificial inflation in the price of Flux Power common stock prior to these disclosures.

66. An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many shares of Flux Power common stock the Claimant purchased, acquired, or sold during the Settlement Class Period, and when that Claimant bought, acquired, or sold the shares. If a Claimant has an overall market gain with respect to their overall transactions in Flux Power common stock during the Settlement Class Period, or if the Claimant purchased shares during the

Settlement Class Period, but did not hold any of those shares through at least one of the alleged partial disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

67. If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *See id.* In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

68. The Net Settlement Fund in its entirety will be distributed to Authorized Claimants and if any funds remain after the initial distribution (for example, due to uncashed or returned checks), further distributions to Authorized Claimants who would receive at least $10.00 from such a re-distribution will be conducted as long as they are cost effective. *Id.* If Lead Counsel, in consultation with the Claims Administrator, deems a further distribution not cost effective, any funds remaining in the Net Settlement Fund shall be donated to a non-profit charitable organization selected by Lead Counsel. *Id.*

69. In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Flux Power common stock that were attributable to the conduct alleged in the Complaint. It does not favor Plaintiffs over any other Settlement Class Member. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

70. To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VII. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND AWARDS TO PLAINTIFFS

71. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of one-third of the Settlement Fund (*i.e.*, $583,333.33 plus interest accrued thereon). Plaintiffs' Counsel also request reimbursement in the amount of $65,904.07 for out-of-pocket expenses incurred by Plaintiffs' Counsel in connection with the prosecution and resolution of the Action, and awards to Plaintiffs in the amount of $7,500 each, or $15,000 in total, for reimbursement of costs, including lost wages, incurred directly related to their representation of the Settlement Class pursuant to as authorized by the PSLRA (15 U.S.C. § 78u-4(a)(4)).

72. The legal authorities supporting the requested fees and expenses are set forth in the concurrently filed Fee Application. The primary factual bases for the requested fees and expenses are set forth below.

### A. The Fee Application

#### 1. The Outcome Achieved is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action

73. Attached hereto as Exhibits 2-3 are declarations from Rosen Law and BES in support of an award of attorneys' fees and reimbursement of litigation expenses. Each declaration sets forth a table reflecting the position, hours, rate, and total lodestar of each individual who worked on this case and a summary of expenses by category. The firms' respective résumés are attached hereto as Exhibits 6-7.

74. The following is a summary chart of the hours expended and lodestar amounts using current rates for the two firms:

| LAW FIRM | HOURS | LODESTAR |
|---|---|---|
| THE ROSEN LAW FIRM, P.A. | 370.23 | $439,953.90 |
| BRAGAR EAGEL & SQUIRE, P.C. | 275.25 | $252,781.25 |
| **TOTAL** | **645.48** | **$692,735.15** |

75. The lodestar charts presented in the declarations from Plaintiffs' Counsel were prepared from contemporaneous daily time records regularly prepared and maintained by Plaintiffs' Counsel. Plaintiffs' Counsel will not request or receive any additional compensation for the time they will spend preparing their reply papers, preparing for and attending the final approval hearing, overseeing the claims administration process, responding to Settlement Class Members' inquiries regarding the Settlement, and preparing the Motion for Class Distribution Order.

76. As set forth in detail in Exhibits 2-3, Plaintiffs' Counsel have collectively expended a total of 645.48 hours in the investigation and prosecution of the Action. The resulting total lodestar is $692,735.15. The requested fee of one-third of the Settlement Fund equals $583,333.33 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a multiplier of 0.84 to Plaintiffs' Counsel's lodestar. This fractional (or "negative") multiplier is reasonable and well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

77. The rates billed by Plaintiffs' Counsel (ranging from $1,050 to $1,550 for partners, $730 to $850 for associates, and $375 to $425 for paralegals, Exs. 2-3 ¶6) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 10 (survey of peer plaintiff and defense law firm billing rates).

78. Throughout this case, Plaintiffs' Counsel devoted substantial time to the prosecution of the Action, as detailed above. Rosen Law and BES maintained control of, and monitored the work performed by, lawyers and other personnel on this case. I personally devoted substantial time to this case and was personally

involved in drafting or reviewing and editing all pleadings, court filings, and other correspondence prepared on behalf of Plaintiffs upon Rosen Law's appointment as Lead Counsel, communicating with Plaintiffs and additional Plaintiffs' counsel on a regular basis, engaging with counsel for Defendants on a variety of matters, and was intimately involved in Settlement negotiations. Other experienced attorneys at the two firms also drafted, reviewed and/or edited pleadings, court filings, and other correspondence prepared on behalf of Plaintiffs and were involved in Settlement negotiations and other matters. Other attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

79. As demonstrated by the firms' respective résumés, Exs. 6-7, Plaintiffs' Counsel are highly experienced and skilled law firms that focus their practices on securities class action litigation. Indeed, Rosen Law and BES have substantial experience in litigating securities fraud class actions and have negotiated scores of other securities class action settlements, which have been approved in courts throughout the country. I believe Lead Counsel's experience added valuable leverage in the settlement negotiations.

**2. Standing and Caliber of Opposing Counsel**

80. The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated considering the quality of the opposition. Here, Defendants were represented by Wilson Sonsini Goodrich & Rosati, P.C. and Wilson Elser Moskowitz Edelman & Dicker LLP, firms with national reputations for the tenacious defense of class actions and other complex civil matters. In the face of this experienced and formidable opposition, Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

**3. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

81. This prosecution was undertaken by Lead Counsel on a fully contingent basis. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.

82. With an average lag time of many years for complex cases like this one to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during nearly a year and half of litigation and incurred $65,904.07 in out-of-pocket litigation-related expenses in prosecuting the Action.

83. Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See supra* ¶45. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels. And, even when that effort is put forth, sometimes you still lose. *Id.*

84. Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted). As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

**4. The Reaction of the Settlement Class to the Fee Application**

85. As noted above, as of March 5, 2026, notice has been provided to 18,921 potential Settlement Class Members and their nominees informing them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund. Craig Decl. ¶9; Exs. A (Notice) and C (Postcard Notice). In addition, the Court-approved Summary Notice was published in *Investor's Business Daily* and transmitted over the *GlobeNewswire*. *Id.* ¶10; Ex. D (confirmations of Summary Notice publication). To date, no objections to the attorneys' fees or expenses requested have been received or filed. Any later-filed objections will be addressed in Plaintiffs' reply papers.

86. In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of one-third of the Settlement

Amount, which equates to a multiplier of 0.84, is fair and reasonable, and is in line with the fee awards that courts in this Circuit and others have granted in comparable cases.

**5. Plaintiffs Support the Fee Application**

87. As set forth in the declarations submitted by Plaintiffs, Mr. Paulson and Mr. Clark each concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Exs. 4-5, ¶¶9-10. Mr. Paulson and Mr. Clark have each been intimately involved in this case since the lead plaintiff motion stage, and their endorsements of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

**B. The Request for Reimbursement of Litigation Expenses Incurred by Plaintiffs' Counsel is Fair and Reasonable**

88. Plaintiffs' Counsel seek reimbursement of a total of $65,904.07 in litigation expenses incurred by Plaintiffs' Counsel during the prosecution of this Action, to be paid from the Settlement Fund. The request for reimbursement of litigation expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

89. The firms' declarations break down by category all expenses incurred by Rosen Law and BES, respectively. Exs. 2-3 ¶¶7-8.

90. The Postcard Notice and long-form Notice informed potential Settlement Class Members that Plaintiffs' Counsel would seek reimbursement of expenses in an amount not to exceed $75,000. The total amount requested by Plaintiffs' Counsel is only $65,904.07. To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard Notice and Notice. If any objection to the request for reimbursement of litigation expenses is made after the date of this filing, Plaintiffs will address it in their reply papers.

91. From the beginning of the case, Lead Counsel were aware that they might never recover any of their expenses. Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

92. The largest component of expenses, $18,034.50, was expended on the retention of a private investigation firm to assist Lead Counsel in their factual investigation into Plaintiffs' claims. Another large component of expenses, $15,550.00, was expended on Plaintiffs' share of mediation fees paid for the services of Mr. Meyer. Another large component of expenses, $5,400.00, was expended on the retention of an expert in the field of financial analysis, loss causation and damages. The expert was consulted at different points throughout the litigation, including on matters related to the preparation of the amended complaint, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

93. The other litigation expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, costs of on-line legal and factual research, fees for press releases and notice to class members, copying costs, and postage and delivery expenses.

**C. Awards to Plaintiffs**

94. Finally, Mr. Paulson and Mr. Clark worked closely with Plaintiffs' Counsel throughout the pendency of this Action in connection with their service as Plaintiffs. For example, they each: (a) collected and produced documents related to their transactions in Flux Power common stock to their counsel; (b) moved to be appointed as lead plaintiff in the Action; (c) reviewed all significant pleadings and briefs filed in the Action; (d) regularly communicated with their attorneys via email and telephone about case developments and litigation strategy; (e) reviewed Court

orders and discussed them with their attorneys; (f) communicated with their counsel regarding mediation related topics and made themselves available during the mediation and settlement negotiations; (g) evaluated and approved the Settlement Amount; and (h) communicated with counsel regarding the process for finalizing the Settlement. *See* Exs. 4-5 ¶5. Accordingly, they seek awards of $7,500 each ($15,000 in total) as reimbursement for their time spent on this action that they otherwise would have spent on their job, investing, or other activities. *Id.* ¶¶12-13.

95. The $15,000 in total requested awards to Plaintiffs represents approximately 0.9% of the $1.75 million Settlement Amount.

96. The litigation expenses incurred by Plaintiffs' Counsel and time spent by Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.

## VIII. CONCLUSION

97. For all the reasons set forth above, the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. The requested attorneys' fee in the amount of one-third of the Settlement Amount, the request for reimbursement of $65,904.07 in litigation expenses, and the requested awards of $15,000 total for Plaintiffs, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 5th day of March 2026, at Jenkintown, Pennsylvania.

*s/ Joshua Baker*
Joshua Baker